

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
09/19/2012

| | | |
|---|---|---|
| IN RE: | § | **Case No. 11-35399** |
| **JOELLA GRAYSON,** | § | **Chapter 13** |
| Debtor(s). | § | **Judge Isgur** |

## <u>MEMORANDUM OPINION</u>

United Texas Investors, L.P.'s ("UTI") claim must be disallowed.  UTI's claim is for an obligation incurred by Grayson in a transaction avoidable under § 548(a)(1)(B).  As the underlying transaction may be avoided, Grayson's obligation to UTI must be disallowed.  Because UTI's claim is not an allowed claim, the lien securing UTI's claim is void pursuant to § 506(d).

### I. Overview

This case concerns the heavily regulated but legal business relationship between lenders and loan brokers, as well as the duties imposed on both for the protection of consumers.

Texas usury statutes prohibit lenders from charging more than 10% simple interest unless otherwise provided for by law.  TEX. FIN. CODE § 302.001.  At the same time, Texas law has long allowed for third-party loan brokers to charge fees for procuring loans and providing other services. *Lovick v. Ritemoney, Ltd.*, 378 F.3d 433 (5th Cir. 2004) ("[T]exas courts have long recognized that loan brokers may charge a fee for their services; the fee is not generally considered interest for usury purposes.")  (citing *Morris v. Miglicco*, 468 S.W.2d 517, 519 (Tex. Civ. App.—Houston 1971)).

These seemingly incompatible notions resulted in case law that was confusing and difficult to apply.  *Lovick*, 378 F.3d at 439-42 (describing the patchwork of rules developed

under pre-CSO Act caselaw relating to brokerage fees).  The enactment and codification of the Credit Services Organization Act (the "CSO Act")[1] in 1987 provided some clarity.

The CSO Act allows entities to charge brokerage fees (known as a "credit service fee" or "CSO fee") but imposes strict regulatory requirements on entities charging the fees (known as "Credit Services Organizations" or "CSOs").  The regulations include:  (i) registration, § 393.101; (ii) posting of a surety bond, § 393.401; (iii) requiring that potential customers receive disclosure statements prior to entering into a contract, § 393.105; (iv) requiring CSOs to provide notice in writing that customers may cancel the contract within 10 days without penalty, § 393.202; and, (v) state licensing requirements, § 393.603[2].

In addition to the extensive regulations, the CSO Act is structured so that even "minor" or "technical" violations of the consumer protection provisions result in forfeiture of fees.  TEX. FIN. CODE § 393.503 (designating that, no matter the violation, actual damages shall be at least equal to the CSO fee paid by the consumer).  The CSO Act appears to strike a delicate balance by allowing loan brokers to operate while imposing extensive regulatory requirements designed to protect consumers.

## II. Background[3]

Behind on mortgage payments and threatened with foreclosure of her home, Joella

---

[1] TEX. FIN. CODE §§ 393.001 *et seq.*

[2] This last regulation became effective on January 1, 2012 and therefore was not a requirement when Grayson entered into the contract in May 2011.

[3] The findings of fact are based primarily upon the evidence and testimony presented at the hearing on April 17, 2012.  Grayson's testimony was not credible as to the *order* in which the events of May 23, 2011 occurred.  At the time Grayson was greatly distressed by her financial situation.  (ECF No. 46 at 6).  Grayson even testified that the events of that day were a blur for her.  (ECF No. 46 at 48).  Thomas Simons (the CSO's employee who initially helped Grayson) gave more reliable testimony.  While Simons didn't recall Grayson particularly, he described how employees normally serve customers. (ECF No. 47 at 153-59).  Simons's testimony was bolstered by Israel Aguilar, the CSO's regional manager who had trained Simons.  (ECF No. 47 at 164).

Grayson sought a loan on May 23, 2011.  (ECF No. 46 at 6).  Grayson went to the Loan Depot, (ECF No. 46 at 6), which is the operating name of TJD Financial Services, Inc. ("TJD").  (ECF No. 50 at 2).  TJD is a Credit Services Organization ("CSO") under Texas law.  TJD connects borrowers with title lenders[4] in exchange for a substantial fee ("CSO fee").

TJD locates lenders (in this case UTI) willing to lend money on a secured basis.  The entire loan proceeds do not go to the borrower.  The title lender pays the CSO fee directly to the CSO from a portion of the loan proceeds.  After payment of other minor loan-related fees, the borrower receives the balance of the loan proceeds.

Grayson's situation is typical.  The ultimate result was that Grayson received $3,750.00 with which to make her overdue mortgage payments, but immediately owed UTI a total of $6,499.00 plus interest as it accrues.  The full $6,499.00 was secured by Grayson's previously unencumbered automobile.  In other words, it cost Grayson $2,749.00 to receive a $3,750.00 loan.[5]  This resulted in an effective annual interest rate of 121.012%.  (Def. Ex. 4).[6]

Upon entering the Loan Depot, Grayson was greeted by Thomas Simons and asked if she was making a payment on an existing loan or applying for a loan.  (ECF No. 47 at 166).  Because she was applying for a loan, Grayson received a Credit Services Organization Disclosure Statement (the "Disclosure Statement").  (ECF No. 147 at 166; Def. Ex. 1).  The CSO Act requires that CSOs provide a disclosure statement to potential clients before any contract is

---

[4] Title lenders offer loans secured by the borrower's motor vehicle.

[5] This $2,749.00 figure is different from the "Finance Charge" of $2,982.40 listed on the front of the Loan Disclosure and Promissory Note.  (Def. Ex. 4).  The "Finance Charge" includes the amount of interest that Grayson would have paid over the life of the loan, but does not include insurance premiums (assuming the lender followed certain requirements with respect to the insurance premiums).  12 C.F.R. § 226.4.

[6] This is the effective interest rate calculated by UTI.  The correct rate is actually slightly higher (122.76%).  (*See* Ex. A).

signed.  TEX. FIN. CODE § 393.105.  Grayson signed and dated the Disclosure Statement under a statement indicating she had received a copy of the Disclosure Statement.  (Def. Ex. 1 at 1).

Simons and Grayson together filled out Grayson's "Application for Credit Services and Third-Party Loan." (Def. Ex. 2).[7] This document listed information such as the loan amount sought, the money's intended use, six personal references, and Grayson's employment information.  (Def. Ex. 2).  Meanwhile, Grayson provided Simons with documentation to prove original clear title to the vehicle.  (ECF No. 147 at 155).  Simons verified the information contained in the application and checked the vehicle title.  (ECF No. 47 at 155).

Simons then called Aguilar, TJD's regional manager.  (ECF No. 47 at 155).  Simons relayed the important information to Aguilar,[8] who was tasked with finding a willing lender. (ECF No. 47 at 156, 165).  Aguilar contacted UTI about making the secured loan.  (ECF No. 47 at 165).

After UTI agreed to make the loan, Simons typed the information into a computer program.  (ECF No. 147 at 156).  This is UTI's computer program, not TJD's.  (ECF No. 47 at 176).[9]  UTI's program then created three typewritten documents to evidence the various

---

[7] There are two different copies of the "Application for Credit Services and Third-Party Loan."  The first is handwritten and is filled out by both the TJD employee (Simons) and the customer (Grayson).  (Def. Ex. 2).  The second is a substantially similar typewritten version.  (Def. Ex. 3).  The second version is only created once a willing lender has been found and the parties are preparing to finalize the various contracts.  (ECF No. 47 at 156).

[8] Simons indicated Aguilar would routinely ask questions such as: (i) How long has the applicant been at the residence?; (ii) How long has the applicant held their current job?; (iii) How much does the applicant make?; and (iv) How much is the vehicle worth?  (ECF No. 47 at 156).

[9] The following exchange occurred at the hearing:
>Grayson's counsel:  Whose computer program generates these documents?
>Aguilar: The lenders [sic].
>Grayson's counsel:  Okay.  Do you have – does TJD have their own computer systems that generate any documents?
>Aguilar:  I was – I'm not aware of that.
>Grayson's counsel:  Okay.  So, the computer system you use in your stores is – are the lenders' –

agreements amongst the parties.  The documents it created were: (i) the typewritten "Application for Credit Services and Third-party Loan" (Def. Ex. 3); (ii) the "Loan Disclosure and Promissory Note" (Def. Ex. 4; hereinafter "Note"); and, (iii) the "Credit Services Agreement" (Def. Ex. 5). (ECF No. 47 at 156, 167-68).

The typewritten "Application for Credit Services and Third-party Loan" was created first. (ECF No. 47 at 168).  This document contained substantially similar information to the handwritten version.  (Def. Ex. 2, 3).

The Note followed.  (ECF No. 47 at 168). The Note memorializes the loan agreement between Grayson and UTI.  The Note created by UTI's computer program includes a form signature from a UTI representative (that is, it is already signed by UTI at the moment it is printed out by the TJD employee).  (Def. Ex. 4 at 2).  The Note included Truth in Lending Act disclosures, as well as a statement indicating that Grayson instructs UTI to pay TJD the CSO fee directly out of the loan proceeds.  (Def. Ex. 4).

The Credit Services Agreement was the final document created.  (ECF No. 47 at 167-68). The Credit Services Agreement memorialized the agreement between Grayson and TJD.  (Def. Ex. 5).  Although there are signature blocks for both Grayson and a TJD employee, no TJD employee signed the Credit Services Agreement. (Def. Ex. 5).

---

Aguilar:  Right.
Grayson's counsel:  -- systems?
Aguilar:  Right.
Grayson's counsel:  Just United Texas Investors or this other second lender?
Aguilar:  All the lenders.  The lender two – the second lender – both lenders are on it.
(ECF No. 47 at 176-77).  Later Aguilar stated he did not know which lender actually owned the computer program. (ECF No. 47 at 177).  Whether UTI owns the intellectual property rights is immaterial.  The important fact is that once UTI agrees to lend to a borrower, a TJD employee enters information into a computer program provided by UTI to create documents which will evidence the various agreements amongst the parties.

After completing all of the paperwork, Simons gave Grayson a check for $3,750.00. (ECF No. 47 at 158).  Grayson left with the check.

Grayson was not able to pay the mortgage company in time.  (ECF No. 46 at 18). Grayson filed for bankruptcy on June 25, 2011.  The first loan payment was to be due June 26, 2011. (Def. Ex. 4).

UTI filed a proof of claim for a secured claim in the amount of $7,547.80.  (Claim's Register #4).  Grayson objected.  (ECF No. 31).   Grayson initially argued the secured claim should only be in the amount of $3,874.00 plus interest.  (ECF No. 31 at 1).[10]

UTI responded to Grayson's objection and also sought approval to file an amended proof of claim.  (ECF No. 32).[11]  UTI acknowledged it overstated its initial proof of claim.  (ECF No. 32 at 2).  The proposed amended proof of claim is in the amount of $6,559.52.  (ECF No. 32 at 2).[12]

Grayson and UTI proposed a settlement on December 28, 2011.  The Court expressed concerns about whether the proposed settlement could be approved given the circumstances and requested supplemental briefing.

Grayson's supplemental brief objected to UTI's claim in its entirety on the theory that UTI and TJD were either not truly separate entities or engaged in illegal fee-sharing.  (ECF No.

---

[10] This figure appears to have been taken from the Note, which lists the "Amount Financed" as $3,874.00.  (Def. Ex. 4 at 1).

[11] The motion to allow the filing of an amended claim was not separately filed on the docket and has not yet been ruled upon.  This Memorandum Opinion moots the issue.

[12] UTI arrived at this amount by taking the $6,499.00 in principal (the "Total Amount Financed" according to the Note) plus 10% interest over 34 days from the date of contract until the date the case was filed.  This amounted to a total of $6,559.52.  The original $6,499 in principal is the sum of: (i) the $3,750.00 given to Grayson personally; (ii) the $2,625.00 given to TJD directly to pay the CSO fee; (iii) the $33.00 UTI paid to the state; (iv) the $25.00 application fee charged by UTI; and (v) the $66.00 first month insurance premium paid by UTI to insure the collateral.  (Def. Ex. 4; ECF No. 47 at 125-32).

41 at 5-8).  Therefore, according to Grayson, UTI is liable for TJD's myriad violations of Texas law.  (ECF No. 41 at 12-14) (listing TJD's numerous CSO Act violations).  Furthermore, Grayson argued that the transfer to TJD (and therefore UTI, under Grayson's theory) was avoidable under § 548(a)(1)(B) as a constructively fraudulent transfer.  (ECF No. 41 at 16).

The hearing on Grayson's claim objection was held on April 17, 2012.  Grayson testified on her own behalf.  Two TJD employees, Thomas Simons and Israel Aguilar, testified.  Crystal Carroll testified as a UTI representative.  Carroll's company, KRC Management Company, is UTI's general partner.  (ECF No. 47 at 101).  Grayson and UTI were allowed to submit additional briefing afterwards.  The Court initially took the matter under advisement on May 1, 2012.

The testimony and evidence presented at the hearing highlighted issues not previously addressed by the parties.  Specifically, the evidence showed that UTI might be liable under alternative theories and that UTI (and TJD) committed additional violations of state and federal law.

The Court requested additional briefing on these issues.  (ECF No. 55).  In addition, the parties were specifically asked, if these issues were not previously litigated by consent, whether the evidentiary record should be reopened.  (ECF No. 55 at 1).

Both Grayson and UTI submitted additional briefing as requested.  (ECF Nos. 59, 60).  UTI argued the above issues were not tried by consent but did not request for the evidentiary record to be reopened.  (ECF No. 59 at 7).  Grayson did not opine as to whether these issues were tried by implied consent.  (ECF No. 60 at 10).  However, Grayson did request that the Court reopen the evidentiary record and allow further discovery on these issues.  (ECF No. 60 at 10).

### III. Trial by Implied Consent

As mentioned above, the testimony and evidence produced at the April 17 hearing indicated that UTI might be responsible for TJD's CSO Act violations under alternative theories. In addition, the evidence produced suggested that UTI and TJD committed additional violations of state and federal law.

At the hearing, UTI did not object to the admission of evidence supporting these alternate theories. However, some of the evidence was also relevant to the issues initially pled by Grayson. Fifth Circuit precedent is clear that trial by implied consent pursuant to Rule 15(b) of the Federal Rules of Civil Procedure may not be inferred in this situation:

> Where a party does not recognize the significance of evidence and so fails to contest it, he cannot realistically be said to have given his implied consent to the trial of unpled issues suggested by it, always assuming that his failure to grasp its significance was reasonable. A prime example of such a circumstances [sic] occurs when evidence is introduced that is relevant to an issue already in the case and there is no indication that the party who introduced the evidence was seeking to raise a new issue.

*Jimenez v. Tuna Vessel Granada*, 652 F.2d 415 (5th Cir. 1981) (holding, under similar facts, that the trial court abused its discretion by determining that unpled issues were tried by implied consent and ruling against a party under the alternate, unpled theory).

The trial court in *Jimenez* denied the defendant due process because the defendant did not have fair notice of, or an opportunity to respond to, these alternate theories of liability. That the trial court ruled against the defendant on a theory of liability not originally pled by the plaintiff did not by itself constitute an abuse its discretion. It is that the trial court ruled against the defendant before the defendant had fair notice of and an opportunity to contest these new issues. *Jimenez*, 652 F.2d at 421 ("We conclude . . . defendant [did not have] fair notice that new issues

were thereby entering the case, issues that it must meet or suffer an adverse judgment.  Nor did

the court give defendant any indication that it contemplated a disposition on such grounds . . . .")

In contrast to the situation in *Jimenez*, the Court notified all parties of these additional

theories of liability and causes of action after the April 17, 2012 hearing.  All parties had the

opportunity to address these issues.  Both UTI and Grayson submitted additional briefing.  The

parties were also asked whether the evidentiary record should be reopened.  UTI did not request

that the evidentiary record be reopened.  The parties received fair notice of and an opportunity to

respond to these issues.

## IV. Analysis

### A.  Adversary Proceeding Not Required

With certain exceptions not applicable here, an adversary proceeding is required

whenever a debtor seeks to recover money or property held by someone else.  FED. R. BANKR. P.

7001(1).  If the debtor seeks the recovery of money or property in connection with an objection

to claim, the debtor must file an adversary proceeding.  FED. R. BANKR. P. 3007(a); *see also* 9

*Collier on Bankruptcy*, ¶ 3007.02 (16th ed.) (discussing situations in which, due to the nature of

relief sought, the claim objection must be consolidated with an adversary proceeding or a

separate adversary proceeding must be filed).

Grayson is not seeking to recovery property held by UTI, nor is she seeking an

affirmative recovery of damages from UTI.  Therefore, it is not necessary that an adversary

proceeding be filed and the claim objection may proceed as a contested matter.

### B.  Disallowance under § 502(b)(1)

The Bankruptcy Code states that courts shall allow a claim "except to the extent that—

such a claim is unenforceable against the debtor and property of the debtor, under any agreement

or applicable law for a reason other than because such claim is contingent and or unmatured . . . ." 11 U.S.C. § 502(b)(1).

The Fifth Circuit interprets Texas law as allowing a violation of the Texas Deceptive Trade Practices Act ("DTPA") to be asserted defensively against a creditor's claim. *Trans Meridian, Inc. v. MBank Fort Worth, N.A. (In re MBank Fort Worth, N.A.)*, 820 F.2d 716 (5th Cir. 1987) (holding that TILA or DTPA counterclaims to a creditor's claim may be asserted defensively even when affirmative claims are barred by the statute of limitations). Grayson may use these statutes (as well as the CSO Act) defensively in her claim objection. In other words, UTI's claim will be disallowed under § 502(b)(1) to the extent UTI is liable under applicable consumer protection statutes.

Additionally, UTI's claim may be disallowed under § 502(b)(1) if the claim is for an obligation incurred in a transaction which may be avoided by the trustee under § 548. 11 U.S.C. § 502(b)(1); 5 *Collier's on Bankruptcy*, ¶ 548.10[1] (16th ed.) ("Avoidance is the setting aside or nullification of a transaction. . . . If the trustee avoids an obligation, nullification means that the transferee acquired no rights as a result of the transaction and that the trustee need not consider the obligation as valid against the estate.").

### C. Credit Services Organization Act ("CSO Act")

Chapter 393 of the Texas Finance Code regulates "Credit Services Organizations" or "CSOs." TEX. FIN. CODE § 393.001 *et seq*. TJD is a CSO, but UTI is not. TEX. FIN. CODE § 393.002. The CSO Act also regulates representatives of CSOs. *See, e.g.*, TEX. FIN. CODE § 393.302 ("A credit service organization *or a representative* of the organization may not . . . .") (emphasis added). Agents are explicitly included in the definition of "representatives." TEX. FIN. CODE § 393.301.

UTI must not violate the CSO Act while acting as TJD's agent.  Any such violation (for which UTI is liable and must pay damages) may be asserted defensively as an objection to claim.

### 1. UTI as TJD's Agent

Grayson argues that UTI and TJD are not truly independent actors, operating as one combined entity.  (ECF No. 41 at 8).  The facts do not support this allegation.

Although the two entities are independent, there is a business relationship between UTI and TJD.  TJD connects potential borrowers (its clients) with UTI.  (ECF No. 47 at 164-65).  Once UTI agrees to make a loan, a TJD employee uses UTI's computer program to create documents evidencing the various agreements amongst the parties.  (ECF No. 47 at 176-77).  Afterwards TJD acts as UTI's loan servicer by collecting payments.  (ECF No. 47 at 135).

UTI's computer program did not merely draft the Note (which evidenced the loan agreement between UTI and Grayson).  UTI's computer program also drafted the Credit Services Agreement (which evidenced the agreement between Grayson and TJD).  In other words, UTI acted as TJD's agent by drafting the Credit Services Agreement on behalf of TJD.

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006).

TJD assented to have UTI act on its behalf in drafting the Credit Services Agreement.  UTI acted as TJD's agent for this purpose when UTI's computer program created the Credit Services Agreement.  UTI's actions related to the drafting of the Credit Services Agreement are subject to the CSO Act.

### 2. Actions Prohibited by the CSO Act

"A credit services organization or a representative of the organization may not . . . make or use a false or misleading representation in the offer or sale of the services of the organization." TEX. FIN. CODE § 393.304.

"A credit services organization or a representative of the organization may not directly or indirectly engage in a fraudulent or deceptive act, practice, or course of business relating to the offer or sale of the services of the organization." TEX. FIN. CODE § 393.305.

### 3. "Letter of Credit"

There is a representation (contained in the Credit Services Agreement and the Disclosure Statement) that TJD will issue a letter of credit if the lender so requires. This representation is glaringly false and misleading.

The Disclosure Statement describes in detail the services TJD will perform. (Def. Ex. 1 at 1). One of the services is the issuance of a letter of credit on behalf of its clients:

> If we approve your application for credit services and you enter into a Credit Services Agreement with us, we would agree to use our best efforts to: . . . issue a letter of credit (the "LOC") to secure your repayment to the Lender if requested by the Lender.

(Def. Ex. 1 at 1).

The Credit Services Agreement again lists the issuance of a letter of credit amongst the services it is to provide. The Credit Services Agreement describes in detail the letter of credit TJD will issue:

> The lender may not give you a loan unless we issue a conditional LOC. If the lender requires a LOC, then you understand that such a LOC may be issued to the lender on your behalf. In the event that the lender requests a LOC, then you agree that you have applied with us as an applicant for a LOC to ensure your payment of the loan. *As an applicant, you request us as issuer to issue our LOC in favor of a third party Lender as*

*beneficiary pursuant to Chapter 5 of the Texas Uniform Commercial Code in an amount not to exceed principal, interest, later charges, dishonored payment device charges or other amounts as applicable on the loan that we arrange for you.   Payment under the LOC is conditioned on presentment by the beneficiary to us of the beneficiary's sight draft and a drawing certificate stating that the loan secured by our LOC is unpaid and in default.*   Partial drawings are permitted provided the aggregate of drawings does not exceed the maximum amount under the LOC.  The LOC will expire 90 days from the maturity date of the loan, or such other date specified in the LOC.  If you timely exercise your right to cancel this Agreement, our LOC shall be automatically revoked and shall have no further effect.  You instruct us to pay the beneficiary's draft up to the maximum amount of the LOC upon presentment to us of documentation complying with the conditions set forth above.  *You understand that we are not responsible for determining the accuracy of any statement made by the third-party lender/beneficiary and that our duty is strictly to pay upon proper presentment of the required documents.*   All matters pertaining to the LOC may be documented in properly authenticated electronic form including, without limitation, issuance of the letter of credit, presentations, drawings, drafts, certificates, and other communications between us and the beneficiary related to the LOC.  You agree to pay us any amounts paid by us pursuant to the LOC, and you authorize us to initiate electronic checks or debits to your bank account for amounts owed to us.

(Def. Ex. 5 at 1) (emphasis added).

TJD did not issue a letter of credit in accordance with Chapter 5 of the Texas Uniform Commercial Code ("Texas UCC").  TJD did not issue a letter of credit in accordance with the Credit Services Agreement.[13]  The testimony at the hearing indicated that TJD has never issued a true letter of credit on behalf of any client.

---

[13] The Credit Services Agreement represented that the letter of credit would conform with Chapter 5 of the Texas UCC.  Therefore, any letter of credit which does not conform with Chapter 5 of the Texas UCC necessarily does not conform with the Credit Services Agreement.  However, in addition to containing the statement that it would conform to Chapter 5 of the Texas UCC, the Credit Services Agreement described in detail the letter of credit to be issued.  The "letter of credit" issued by UTI also failed to meet this separate description.

Carroll (UTI's representative) testified that UTI requests a letter of credit from TJD for every loan.  (ECF No. 47 at 117-18).  TJD was therefore required to issue a letter of credit as described in the Credit Services Agreement and Disclosure Statement.

Carroll testified that there was a "letter of credit"[14] agreement between TJD and UTI. (ECF No. 47 at 117).  Carroll's description of the "letter of credit" agreement indicates TJD did not issue an actual letter of credit on Grayson's behalf.  Moreover, as Carroll testified that this "letter of credit" is the instrument always used, TJD has never issued an actual letter of credit (as it represents it will in the standard Disclosure Statement and, presumably, the accompanying credit services agreement).

Under the terms of the "letter of credit" agreement, UTI does not have the right to payment upon presentment of the documents.  (ECF No. 47 at 118).  When a borrower defaults, UTI must wait for payment until after the collateral is repossessed and foreclosed upon.  (ECF No. 47 at 118-19). ("[I]f they provide a loan and then that customer's vehicle is repossessed, it's taken to auction and what have you and there's not enough collateral there to cover the loan, then TJD says that they will pay that difference to the lender.").[15]  Only afterwards may UTI seek any deficiency from TJD.

This "letter of credit" agreement does not fit the description contained in the Credit Services Agreement.  (Def. Ex. 5 at 1) ("Payment under the LOC is conditioned on presentment by the beneficiary to us of the beneficiary's sight draft and a drawing certificate stating that the loan secured by our LOC is unpaid and in default.").

---

[14] When the phrase "letter of credit" appears in quotes, the Court is referring to the agreement between TJD and UTI, which both parties called a "letter of credit," but which is not an actual letter of credit pursuant to Chapter 5 of the Texas UCC.

[15] Carroll later described the "letter of credit" agreement as "just as good as a handshake."  (ECF No. 47 at 136).

Additionally, this is not a letter of credit under Chapter 5 of the Texas UCC.  Texas law defines a letter of credit as "a definite undertaking that satisfies the requirements of [Texas Business and Commerce Code § 5.104] by an issuer to a beneficiary at the request or for the account of an applicant or, in the case of a financial institution, to itself or for its own account, to honor a documentary presentation by payment or delivery of an item of value."  TEX. BUS. & COMM. CODE § 5.102(a)(10).  The Texas Business and Commerce Code further states:

> Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary.

TEX. BUS. & COMM. CODE § 5.103(d).

These provisions indicate a financial instrument is not a letter of credit under Texas law where the issuer's obligation to honor a documentary presentation is dependent on the applicant's nonperformance of a contract.  This interpretation is bolstered by Comment 6 to § 5.102:

> When a document labelled a letter of credit requires the issuer to pay not upon the presentation of documents, but upon the determination of an extrinsic fact such as applicant's failure to perform a construction contract, and where that condition appears on its face to be fundamental and would, if ignored, leave no obligation to the issuer under the document labelled letter of credit, the issuer's undertaking is not a letter of credit.  It is probably some form of suretyship or other contractual arrangement and may be enforceable as such.

TEX. BUS. & COMM. CODE § 5.102 cmt. 6.

This instrument is not a letter of credit under Texas law because UTI is not entitled to payment upon presentment.

Both TJD and UTI (as TJD's agent) represented that, in exchange for payment of the CSO fee, TJD would provide certain services—including the issuance of a letter of credit if requested by a lender.  This is a false and misleading representation in the offer or sale of the services of a credit services organization.  TJD and UTI violated § 393.304 of the Texas Finance Code.  This is also a fraudulent and deceptive business practice relating to the offer or sale of the services of a credit services organization.  TJD and UTI violated § 393.305 of the Texas Finance Code.

UTI participated in the misrepresentation only with respect to the Credit Services Agreement, which it drafted as TJD's agent.  (TJD committed these violations with respect to both the Disclosure Statement and the Credit Services Agreement.)

Neither § 393.304 nor § 393.305 have knowledge or materiality requirements.  Even so, UTI knew both that the representation was false and misleading and that the representation related to a material issue.

UTI had actual knowledge that the Credit Services Agreement contained false and misleading representations.  Carroll, a UTI representative, testified that TJD never issues UTI an actual letter of credit.  (ECF No. 47 at 117-18).  UTI therefore knew any statement to the contrary (e.g., that TJD would issue a letter of credit on Grayson's behalf) was false and misleading.

The false and misleading representation was material.  UTI had actual knowledge of this as well.  Carroll testified that the issuance of a true letter of credit could positively affect the interest rate at which UTI was willing to lend:

> **The Court**: Well, do you rely on their – what you're calling letter of credit, as part of your fee calculation?

**Carroll**:  No, sir.  I mean – we don't – we don't need to rely on that.  We have the collateral.

**The Court**:  So, you would make this loan without [TJD's] guarantee of repurchase –

**Carroll**: Yes, sir.

**The Court**: -- at ten percent.

**Carroll**:  I mean – well, it's not a repurchase.  It's just a fulfillment of the loan.

**The Court**:  But you'd make it without that?

**Carroll**:  I couldn't make that decision.  I've got to – I mean, I would have to go through all of my partners and make sure that that was something that they were comfortable with.

**The Court**:  If there was an actual letter of credit from Wells Fargo Bank, using Mr. Callier's [UTI's counsel] example, would you make a loan at less than ten percent.

**Carroll**:  I mean, I don't see why not.  I mean – these are all things that I can't make a decision on on [sic] my own.

(ECF No. 47 at 141-42).  When further pressed whether an actual letter of credit should drive down the interest rate on a loan, Carroll stated:  "Absolutely, it could."  (ECF No. 47 at 143).  Had TJD actually performed under the contract as promised, Grayson could have received a more favorable interest rate.

### 4.  "We Agree to Use our Best Efforts . . ."

In a section entitled "Description of our credit services," the Credit Services Agreement states:

> [W]e agree to use our best efforts to: (1) identify a lender that may make a loan to you with an interest rate not to exceed 10% per annum; (2) assist you in preparing and completing the information and documents that the Lender requires you to submit in order to obtain the loan; and (3) issue a

> letter of credit (the "LOC") to secure your repayment to the Lender if requested by the lender.

(Def. Ex. 5 at 1) (emphasis added).  A similar description is contained in the Disclosure Statement.  (Def. Ex. 1 at 1).  The implication is that TJD will shop around to procure the most favorable loan terms possible for their clients.  Aguilar's testimony indicated this is not in fact what occurs:

> **Valdez [Grayson's counsel]**:  Do you try and find – do you try and find the best deal for the borrower?
>
> **Aguilar**:  No.  Just pretty much who's going to buy the loan.
>
> **Valdez**:  Okay.  So, both organizations you work with offer loans at ten percent interest?
>
> **Aguilar**:  That's correct.
>
> **Valdez**:  Not – not no – never less?
>
> **Aguilar**:  No.
>
> **Valdez**:  Never more?
>
> **Aguilar**:  No.
>
> **Valdez**:  So, it's going to be the exact same loan regardless of who the lender is?
>
> **Aguilar**:  That's correct.

(ECF No. 47 at 174).

The loans that TJD procures for borrowers have the same interest rate no matter which lender is used.  (ECF No. 47 at 173-74).  In fact, TJD currently does business with only two lenders.  (ECF No. 47 at 173).  All of TJD's loans feature a 10% simple interest rate—the maximum allowable by Texas law under most circumstances.  TEX. FIN. CODE § 302.001.  TJD does not seek to obtain the best loan terms possible for its clients.

The above statement is a false and misleading representation in the offer or sale of the services of a credit services organization. TJD and UTI violated § 393.304 of the Texas Finance Code. Intentionally making such a statement is a fraudulent and deceptive business practice relating to the offer or sale of the services of a credit services organization. TJD and UTI violated § 393.305 of the Texas Finance Code.

UTI committed these violations only with respect to the Credit Services Agreement, which it drafted as TJD's agent. (TJD committed these violations with respect to both the Disclosure Statement and the Credit Services Agreement.)

### 5. Actions Required by the CSO Act

"The contract must have attached two easily detachable copies of a cancellation notice." TEX. FIN. CODE § 393.202(b). The CSO Act prescribes the specific wording the cancellation notice must contain. TEX. FIN. CODE § 393.202(b).

Simons, the TJD employee who aided Grayson, testified that Grayson did not receive a contract with two easily detachable copies of a cancellation notice:

**Court**: Okay. So, turn to the Credit Service Agreement.

**Simons**: Yes, sir.

**Court**: You're telling me that – when you go then to the last page of that –

**Simons**: Uh-huh.

**Court**: -- that is two notices of cancellation?

**Simons**: Yes.

**Court**: You keep one; you give her one?

**Simons**: Yes.

**Court**: So, she goes home only with a single notice of cancellation?

**Simons**: Right.  That is correct.

(ECF No. 47 at 162).  This is an additional violation of the CSO Act, but the violation was committed only by TJD (not UTI).

"A credit services organization shall give to the consumer, when the document is signed, a copy of the completed contract and any other document the organization requires the consumer to sign." TEX. FIN. CODE § 393.203.

Aguilar testified that, of the documents TJD requires the customers to sign, TJD keeps a signed copy on file and gives an unsigned copy to the customer for their records.  (ECF No. 47 at 165) ("We get two sets of copies.  One of them is the one we keep signed by the customer, and the other one is [sic] we provide the customer.  Because if you understand, there's so many pages, we don't make them sign both of them.").  A copy of the completed contract implies the contract with all of the requisite signatures.  Aguilar himself stated as much.  (ECF No. 47 at 178) ("[The document would be considered completed when it has the A]pplicant's full name, address, city, county, state, zip code and the signature.").[16]  TJD violated § 393.203 of the Texas Financial Code.

"The breach by a credit services organization of a contract under this chapter, or of an obligation arising from a contract under this chapter, is a violation of this chapter."  TEX. FIN. CODE § 393.204.  As discussed above, TJD breached its contract with Grayson by failing to provide the services described in the Disclosure Statement and the Credit Services Agreement.

These three violations were committed by TJD, not UTI.  Grayson must file an adversary proceeding against TJD if she wishes to pursue these violations.

---

[16]  Section 393.202 of the CSO Act (and the documents signed by Grayson) provide for a 3 day right of rescission.  The right commences on the date that the transaction is completed.  Because no contract was ever completed (TJD never signed the agreement), Grayson's right of rescission has not yet expired.

### 6. Damages for UTI's CSO Act Violations

Although UTI violated the CSO Act, Grayson has not proved that she was injured by UTI's violations.

The CSO Act requires an injury in order for a consumer to recover actual damages. TEX. FIN. CODE § 393.503(a) ("A consumer *injured* by a violation of this chapter is entitled to recover: actual damages in an amount not less than the amount the consumer paid the credit services organization . . . .") (emphasis added).   In contrast, a consumer need not demonstrate an actual injury in order to obtain injunctive relief. TEX. FIN. CODE § 393.502 ("A district court on the application of the attorney general or a consumer may enjoin a violation of this chapter."); *see also Ranzy v. Extra Cash of Texas, Inc.*, 2012 WL 1015923 at *6 n.3 (S.D. Tex. March 22, 2012) ("Whether Ranzy is able to show that she was 'injured by a violation of [the CSO Act]' is as yet unknown.  But she did show a violation of the chapter and is entitled to the injunctive relief the court granted.").

Grayson cannot demonstrate an injury related to UTI's violations.  UTI's CSO Act violations, §§ 393.304-305, involve misrepresentations relating to the offer or sales of a credit services organization.[17]  Specifically, UTI knowingly placed false and deceptive language into the Credit Services Agreement.

Grayson cannot prove she was injured by UTI's CSO Act violations because she simply was not aware of the representations contained in the relevant documents.  Grayson herself stated that the events of that day were a "blur" due to her desperate financial situation.  (ECF No. 46 at 49).  Grayson admitted that she did not read all of the documents that she signed.  (ECF No. 46

---

[17] Again, UTI is not a CSO but acted as UTI's agent (and therefore was subject to the requirements of the CSO Act).

at 30) ("Up under the pressure I was under, not – I didn't read every single document, no."). Admitting that she did not read every document is certainly not an admission that she did not read *any* document.   However, UTI's counsel reviewed in detail the various documents with Grayson at the hearing and Grayson's testimony leaves little doubt that she did not read the relevant provisions, did not understand them, or both.[18]

The fact that Grayson was unaware of UTI's misrepresentations is fatal to any attempt to demonstrate injury.  Grayson's lack of knowledge of the misrepresentations negates causation. *Cf. Prudential Ins. Co. v. Jefferson Associates, Ltd.*, 896 S.W.2d 156 (Tex. 1995) (causation negated where misrepresentations did not become part of the basis of the bargain between the parties).   As she cannot demonstrate an injury, Grayson is not entitled to have the claim disallowed because of UTI's violations of the CSO Act.

TJD committed additional violations of the CSO Act.  These violations (that is, TJD's CSO Act violations under sections other than §§ 393.304-305) are of a different nature. TJD did not file a claim in this case.  Grayson, if she chooses to pursue TJD for these CSO Act violations, must file an adversary proceeding.

### D.  Texas DTPA

#### 1. CSO Act Violations Actionable Under Texas DTPA

UTI's and TJD's CSO Act violations are also actionable under the Texas DTPA. Violations of other consumer protection statutes are actionable under the DTPA in certain

---

[18] Grayson admitted to not reading the "description of our credit services" section of the Disclosure Statement. (ECF No. 46 at 33-34).  Grayson indicated she had no idea that she was paying a fee for the CSO services, although several of the relevant documents indicated that this was to be part of the transaction.  (ECF No. 46 at 36).  Grayson testified that she was unaware that she was dealing with two separate entities (TJD as the CSO, and UTI as the lender).  (ECF No. 46 at 21-22).  Grayson admitted she did not read the Application for Credit Services "until full understanding."  (ECF No. 46 at 47).  Grayson testified that she believed by signing the Note next to the line for Single Interest Property insurance she was declining the insurance, even though her signature is immediately under a statement reading "I want single interest property insurance."  (ECF No. 46 at 57; Def. Ex. 4) (emphasis in original).

circumstances.  TEX. BUS. & COMM. CODE § 17.43 ("An act or practice that is a violation of a provision of law other than this subchapter may be made the basis of an action under this subchapter if the act or practice is proscribed by a provision of this subchapter or is declared by such other law to be actionable under this subchapter.").  The CSO Act is one of these so-called "tie-in" statutes.

The CSO Act's "tie-in" provision declares CSO Act violations to be deceptive trade practices actionable under the DTPA. TEX. FIN. CODE § 393.504 ("A violation of [Chapter 393] is a deceptive trade practice actionable under Subchapter E, Chapter 17, Business & Commerce Code.").

Notice is a prerequisite for a suit seeking economic or mental anguish damages under § 17.50(b)(1).  Grayson's claim objection is akin to a DTPA counterclaim, for which notice is not required.  TEX. BUS. & COMM. CODE § 17.505(b).

### 2. Producing Cause

The fact that Grayson was unaware of UTI's misrepresentations is again fatal.

Under the DTPA, "[a] consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish . . . ."  TEX. BUS. & COMM. CODE § 17.50(a) (listing four generic categories of DTPA actions).  The Texas Supreme Court previously held that causation may be negated where a misrepresentation does not become part of the basis of the bargain between the parties.  *Prudential Ins. Co. v. Jefferson Associates, Ltd.*, 896 S.W.2d 156, 164 (Tex. 1995)

As Grayson cannot demonstrate an injury from UTI's DTPA violations, Grayson is not entitled to have the claim disallowed.

23 / 32

TJD's additional CSO Act violations are also DTPA violations.  As with the CSO Act violations, Grayson must file an adversary proceeding if she wishes to pursue TJD for the related DTPA violations.

### E.  Truth in Lending Act ("TILA") Violations

UTI acknowledges the Note is regulated by TILA (the Federal Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq*).  (Def. Ex. 4 at 1). Under TILA, creditors in closed-end consumer credit transactions must disclose certain material information to borrowers.  15 U.S.C. § 1638(a). The required disclosures include: (i) identity of the creditor required to make the disclosures; (ii) the "Amount Financed"; (iii) an itemization of the Amount Financed; (iv) the "Finance Charge"; (v) the "Annual Percentage Rate" ("APR"); (vi) the "Total of Payments"; and, (vii) the schedule of payments the borrower is required to make in order to repay the Total of Payments.  15 U.S.C. §§ 1638(a)(1)-(a)(6).   Creditors who fail to accurately make the required disclosures may be liable to the borrower for damages.  15 U.S.C. § 1640.

After the April 17 hearing, the parties were asked to brief the issue of whether UTI violated TILA.  (ECF No. 55).  The specific issue mentioned was whether the Total of Payments figure provided in the Note was correct.  (ECF No. 55 at 1).

Neither party adequately briefed this issue.  (ECF No. 59 at 3-4; No. 60 at 6-7).  Upon further review, UTI did not violate TILA as it relates to the Total of Payments disclosure.

In a closed-end consumer credit transaction subject to TILA, the creditor is required to include a Total of Payments figure, which is equal to the sum of the Amount Financed plus the Finance Charge.  15 U.S.C. § 1638(a)(5).  In addition, the creditor must disclose "[t]he number, amount, and the due dates or period of payments scheduled to repay the total of payments."  15 U.S.C. § 1638(a)(6) (sometimes referred to as the "Schedule of Payments").

The Note gives the figure $6,863.52 for the Total of Payments, which is $7.12 more than the sum of the listed Finance Charge ($2,982.40) and Amount Financed ($3,874.00).  (Def. Ex. 4 at 1).  UTI acknowledges the Note understated the Finance Charge by $7.12.  (ECF No. 59 at 4).[19]  If the correct Finance Charge amount is used (that is, $2,989.52 instead of the listed $2,982.40), then the Total of Payments does equal the sum of the Finance Charge plus the Amount Financed.

The Note also indicates Grayson's payment schedule is 12 monthly payments of $637.96, for a total of $7,655.52.  (Def. Ex. 4 at 1).  This amount is $792 greater than $6,863.52 (the Total of Payments amount).   The figure $792 represents the cost of the single interest property insurance over the life of the loan.  (Def. Ex. 4 at 1).

TILA requires that creditors provide borrowers with "[t]he number, amount, and due dates or period of payments scheduled to repay the total of payments." 15 U.S.C. § 1638(a)(6). The fact that Grayson, after following the schedule of payments listed in the Note, will actually pay $792 more than the Total of Payments figure (in order to repay the insurance) does not appear to be a violation.

UTI did violate several other TILA provisions, however.[20]

UTI miscalculated the loan's APR.  The Note lists the APR as 122.012%.  (Def. Ex. 4 at 1).  The correct APR is actually 122.77%.  (*See* Ex. A). The APR is understated by 1.76%.  This is outside the applicable error range of one eighth of 1% or .125%.  12 C.F.R. § 226.22(a)(2).

---

[19] The understatement is not a violation because TILA provides that a Finance Charge understated by no more than $10 shall be treated as accurate where the Amount Financed is greater than $1,000.00.  12 C.F.R. § 226.18(d).

[20] As UTI's claim is disallowed under the fraudulent transfer theory discussed below, the Court need not address trial by implied consent issues which might result if the Court were to disallow UTI's claim for these TILA violations (which are distinct from the TILA violation the parties were asked to brief).

UTI did not correctly itemize the amount financed as required.   15 U.S.C. § 1638(a)(2)(B).  This issue was first discussed at the April 17, 2012 hearing.  (ECF No. 47 at 126-33).  The sum of the individual figures provided under the heading "Itemization of Amount Financed" is $91 less than the "Total Amount Financed" listed on the Note.  (Def. Ex. 4 at 1).  Two payments (a $25 application fee and a $66 insurance premium payment) are not listed.  (Def. Ex. 4).  Due to these omissions the itemization is inaccurate.  It is also incomplete because part of the itemization requirement is that third-parties receiving payment by the creditor on the consumer's behalf must be identified.  15 U.S.C. § 1638(a)(2)(B)(iii).

If Grayson chooses to pursue UTI for damages related to these TILA violations, an adversary proceeding must be filed.

**F. Constructive Fraudulent Transfer Under § 548(a)(1)(B)**

The obligation incurred by Grayson includes the amount UTI paid to TJD for the CSO fee.  As set forth below, UTI's payment of the CSO fee to TJD provided no value to Grayson.  As a result, the obligation incurred far exceeds the value Grayson received and the entire transaction is avoidable under § 548(a)(1)(B).   As the underlying obligation is unenforceable, UTI's claim is disallowed pursuant to § 502(b)(1).

In the transaction outlined above, UTI was the recipient of Grayson's obligation to repay a debt of approximately $6,499.00.[21]  The Bankruptcy Code provides that:

> The trustee may avoid any transfer . . . of an interest of the debtor in property, *or any obligation incurred by the debtor*, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily— . . . received less than a reasonably equivalent value in exchange for such transfer or obligation; and was insolvent on the date that such transfer was made or such

---

[21] This was the approximate principal amount of the loan.  (*See supra* note 12).  UTI's proposed amended claim is in the amount of $6,559.52.  (ECF No. 32 at 2).

obligation was incurred, or became insolvent as a result of such transfer or obligation.

11 U.S.C. § 548(a)(1) (emphasis added).

UTI's brief filed after the April 17, 2012 hearing did not contest that Grayson was insolvent on the date the transfer was made. (ECF No. 51). Grayson's uncontroverted testimony at the April 17, 2012 hearing indicated that she was indeed insolvent on the date of the transaction. (ECF No. 46 at 7-98).

Grayson did not receive reasonably equivalent value in exchange for incurring the obligation to repay $6,499.00. In exchange for Grayson incurring the obligation, UTI did four things: (i) gave Grayson $3,750.00; (ii) paid TJD $2,625.00 directly for the CSO fee; (iii) paid the first month's insurance premium; and, (iv) paid other minor loan-related fees. (Def. Ex. 4).

As discussed in detail above, TJD did not perform the services it agreed to perform, thereby materially breaching the Credit Services Agreement, and also committed numerous violations of the CSO Act. Consequently, Grayson did not owe TJD the CSO fee. Paying off a debt a debtor does not in fact owe does not confer a benefit upon the debtor. *Cf. In re Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir. 1988) (in dispute over whether debtor was "insolvent" at time of transfer, debtor's contingent liabilities should have been written down on its balance sheet because certain liabilities were unenforceable) ("An unenforceable debt is not much of a liability."). As set forth below, the payment of an obligation (even if instructed to do so by the Debtor) that is not owed by the Debtor does not constitute "value" under § 548. UTI's payment of the $2,625 CSO fee to TJD did not benefit Grayson. To put it another way, in exchange for incurring an obligation of $6499.00, Grayson received goods and services with a

value of only $3,874.00.   Grayson received less than reasonably equivalent value in this transaction.[22]

It is not material that a provision in the Note indicates it is Grayson who instructed UTI to pay TJD the CSO fee directly.   UTI is in the same position as other creditors who, at a debtor's request, confer a benefit on a third party in exchange for the debtor's guaranty or grant of a security interest.   *See, e.g.*, *Leibovitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 579-80 (7th Cir. 1998).   "Courts generally find a lack of reasonably equivalent value when the transfer or obligations benefits a third party, such as an individual's payment of a relative's debt or the giving of a guaranty of another's debts."   5 *Collier on Bankruptcy*, ¶ 548.05[2][b] (16th ed.) (citing cases from several circuits).

UTI had a way to protect itself.   UTI could have given the full loan proceeds directly to Grayson.   What Grayson chose to do with the loan proceeds thereafter would not affect her obligation to UTI (or the validity of UTI's claim).

Although it is not necessary for avoidance under § 548, UTI knew it was paying a debt that Grayson did not in fact owe.   UTI knew of the promises made by TJD because UTI drafted the Credit Services Agreement.   UTI knew that TJD never performed these services for its clients (at least in transactions involving UTI).   When UTI paid TJD the CSO fee, UTI knew (as it had not received an actual letter of credit and TJD did not attempt to negotiate better loan terms) that TJD had already materially breached the Credit Services Agreement and was thus not entitled to the CSO fee.   UTI cannot pretend to be an innocent party.

---

[22] Because the Court finds that the obligation was unenforceable, this opinion does not evaluate whether the amount of the CSO fee exceeded the fair value of the services provided by the CSO.

UTI also received a security interest in Grayson's previously unencumbered vehicle, which constitutes a transfer under the Bankruptcy Code. 11 U.S.C. § 101(54). The transfer of the security interest would also be avoidable under § 548(a)(1)(B). This is not necessary, however, because a lien securing a claim against a debtor which is not an allowed secured claim is void. 11 U.S.C. § 506(d).

### G. Holder in Due Course Rule

It was a violation of the Holder in Due Course rule for TJD to have accepted payment from proceeds of the Note because the Note did not contain statutorily mandated provisions. As UTI's claim is disallowed under the above constructive fraudulent transfer theory, UTI's potential liability need not be addressed.

The Federal Trade Commission promulgated what is commonly referred to as the "Holder in Due Course" rule. 16 C.F.R. §§ 433.1 *et seq.* This requires that:

> In connection with any sale or lease of goods or services to consumers, in or affecting commerce as 'commerce' is defined in the Federal Trade Commission Act, it is an unfair or deceptive act or practice within the meaning of Section 5 of that Act for a seller, directly or indirectly, to: . . . [a]ccept, as full or partial payment of such sale or lease, the proceeds of any purchase money loan (as purchase money loan is defined herein), unless any consumer credit contract made in connection with such purchase money loan contains the following provision in at least ten point, bold face, type:

> NOTICE

> ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

16 C.F.R. § 433.2

TJD is a "seller" as that term is defined for the Holder in Due Course rule.  16 C.F.R. 433.1 ("A person who, in the ordinary course of business, sells or leases goods or services to consumers.").  TJD's normal course of business is to sell loan-related services (principally, finding willing lenders) to consumers.

Grayson is a "consumer" as that term is defined for the Holder in Due Course rule.  16 C.F.R. § 433.1 ("A natural person who seeks or acquires goods or services for personal, family, or household use.").

The Note is a "purchase money loan" as that term is defined for the Holder in Due Course rule.  16 C.F.R. § 433.1 ("A cash advance which is received by a consumer in return for a 'Finance Charge' within the meaning of the Truth in Lending Act and Regulation Z, which is applied, in whole or substantial part, to a purchase of goods or services from a seller who (1) refers consumers to the creditor or (2) is affiliated with the creditor by common control, contract, or business arrangement.").

Grayson received a cash advance from the Note, which was applied in substantial part to Grayson's purchase of services from TJD.  TJD referred Grayson to UTI for the Note.[23] The only remaining question is whether Grayson received the cash advance under the Note in return for a "Finance Charge."

The Truth in Lending Act and Regulation Z defines a "Finance Charge" as:

> The cost of consumer credit as a dollar amount.  It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.

---

[23] TJD is also affiliated with UTI in the sense of having a "business arrangement," which is defined as "[a]ny understanding, procedure, course of dealing, or arrangement, formal or informal, between a creditor and a seller in connection with the sale of goods or services to consumers or the financing thereof."  16 C.F.R. 433.1.

16 C.F.R. § 433.1.  The interest rate charged by UTI for making the loan to Grayson qualifies as a "Finance Charge."   12 C.F.R. § 226.4(b)(1).   Therefore, the Note meets the definition of a "purchase money loan."

It was a violation of the Holder in Due Course rule for TJD to accept any payments from the proceeds of the Note because the Note did not contain the above notice as required by 16 C.F.R. § 433.2.

**<u>Conclusion</u>**

The Court will issue a separate Order in accordance with this Memorandum Opinion.

SIGNED **<u>September 18, 2012.</u>**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

# Exhibit "A"

## Calculation of Contract Annual Percentage Rate in Grayson Loan

| Month | Initial Loan Advance | Lender Scheduled Advance for Insurance | Grayson Scheduled Payment for Insurance | Loan Payment (Principal and Interest) | Net Cash Exchange | Calculated Annual Percentage Rate* |
|---|---|---|---|---|---|---|
| | | | | | | 122.77% |
| 0 | $3,808.00 | $66.00 | | $0.00 | $3,874.00 | |
| 1 | $0.00 | $66.00 | $66.00 | $571.96 | ($571.96) | |
| 2 | $0.00 | $66.00 | $66.00 | $571.96 | ($571.96) | |
| 3 | $0.00 | $66.00 | $66.00 | $571.96 | ($571.96) | |
| 4 | $0.00 | $66.00 | $66.00 | $571.96 | ($571.96) | |
| 5 | $0.00 | $66.00 | $66.00 | $571.96 | ($571.96) | |
| 6 | $0.00 | $66.00 | $66.00 | $571.96 | ($571.96) | |
| 7 | $0.00 | $66.00 | $66.00 | $571.96 | ($571.96) | |
| 8 | $0.00 | $66.00 | $66.00 | $571.96 | ($571.96) | |
| 9 | $0.00 | $66.00 | $66.00 | $571.96 | ($571.96) | |
| 10 | $0.00 | $66.00 | $66.00 | $571.96 | ($571.96) | |
| 11 | $0.00 | $66.00 | $66.00 | $571.96 | ($571.96) | |
| 12 | $0.00 | $0.00 | $66.00 | $571.96 | ($637.96) | |

*The APR is based on the monthly Net Cash Exchange set forth in the table.